Good morning, Your Honors. May it please the Court, my name is Stephanie Parent and I represent Northwest Environmental Defense Center, or NEDC, Northwest Sport Fishing Industry Association and Public Employees for Environmental Responsibility. I'll be sharing my time with Mr. Weaver representing the Yakama Nation and I'm going to try to save one minute for rebuttal. Your Honor, NEDC here challenges Bonneville Power Administration's decision not to continue the funding for the Fish Passage Center as required by the Northwest Power Act. Bonneville first memorialized that decision on December 8, 2005 when it issued a program solicitation to replace the center in which it said it had decided to implement report language that was found nowhere in the appropriations bill eventually passed by Congress and signed by the President. That decision was further implemented on January 26, 2006 when Bonneville announced that it had selected two other entities to replace the center. NEDC does not challenge the subsequent contracts that were entered or the contracting process. This is important because BPA's funding decision must have a rational basis at the time the decision was made and must be supported by the administrative record. Otherwise, this Court must hold that it's arbitrary and capricious and set it aside. BPA's argument here is entirely post hoc. It argues in its brief that it was merely exercising its discretion to decide what it will and will not fund. The record, however, is clear that rather than exercising its discretion, BPA believed that it had no discretion because of the report language which said it should not fund the center and it acted accordingly. Shortly after the report language issued in November last year, BPA stated legislation was passed which ordered BPA to terminate funding to the center. It's found in our further excerpts record at 5. In the program solicitation which BPA published on the Internet to the public, BPA represented that Congress had passed, quote, legislation, unquote, and, quote, that it was forbid, unquote, from funding the center. The rest of the administrative record demonstrates that Bonneville believed itself to be merely implementing the report language and that its discretion was bound by that report language. So you think they just made a mistake? Your Honor, I don't believe they just made a mistake. I believe that they were trying to implement the report language because it was – it existed. I do believe that the record shows that what they're arguing now to this Court is a post hoc rationalization. They were not merely exercising their discretion. They were implementing the report language. That mistake, whether that's in fact what it was, cannot be countenanced by this Court and given the effect of law. Assuming that – assuming that we were to determine that BPA's view of the legislative reports was an error of law that would vitiate their decision, would we still take a look at the consistency argument or would we stop there? Your Honor, the Court could take two courses. You could stop there because under the Administrative Procedure Act, they have issued an arbitrary and capricious decision and it should be set aside. However, with respect to the ultimate relief, it would be important that petitioners in the Fish Passage Center were placed in the same position that existed prior to the report language, which in fact would only happen if this Court were to issue an order that is similar to the state order that this Court issued in March, continuing the funding for the Center until such time that Bonneville can make a decision that may or may not be supportable under the consistency provision. However, because we are in this place now where we have several different entities trying to undertake what the Fish Passage Center has historically done for 23 years, you may reach the consistency provision because it will inform Bonneville's next decision as to what exactly that means. We've really gotten off track of the Northwest Power Act here where Bonneville claims that it has unlimited, virtually unlimited discretion to decide what it will and will not fund. That is not what the plain language of the Northwest Power Act says. Congress has limited Bonneville's discretion with respect to funding in that provision of the Act, which states that Bonneville shall fund in a manner consistent with the Fish and Wildlife Program adopted by the Council. Bonneville claims that the Council cannot bind it, but this Court has already settled that issue in the Seattle Master Builders case where the Court held that the Council is an interstate compact, which was created by state law and adopted by Congress in the Northwest Power Act. This Court has held that the Council is constitutional and that the Federal Government can be subject to state law where there is a clear congressional mandate and specific legislation which makes the authorization of state control clear and unambiguous. And I would submit, Your Honors, that the consistency of Bonneville must fund consistent with the Council's program. May I ask you a practical question? I'm from Arizona and what I know about salmon is it goes with a chardonnay, but let me ask you a practical question. What difference does it make, in practical terms, whether the duties of the Fish Passage Center are performed by the Fish Passage Center or by the Commission in the Patel Laboratory? What's the practical difference here? As a practical matter, Your Honor, there are many issues. There are many harms that are caused by the differences. First and foremost, I can't emphasize enough, and the Council has said this in its briefs, that to allow Bonneville to behave in this manner is to reduce or to affect the delicate balance that Congress has set up in the Northwest Power Act. The structure of the Act makes it clear that the Council is to be making these decisions. And so, to allow the Council to then decide, well, we're not going to fund the Center specifically, we're going to do something else, would actually be a de facto amendment of the program without going through the amendment process that is required by the Northwest Power Act. But they've got somebody, they've lined up two other folks to do the duties of the... Yes, and it's also based on the unique facts we have before this Court in this particular instance. In this case, the program, as we've stated in our briefs, is fairly general. It has biological objectives, it has ecological criteria, and so most projects that are being recommended for funding by the Council will be consistent with that overall umbrella. The Fish Passage Center is different. The Council's 2000 program and the 2003 amendments expressly call for the continued operation of the Fish Passage Center. I think this is probably a result of the history of the Fish Passage Center, which has been funded for the last 23 years, and through the years has been questioned about the objectivity of its science. And so the program, subsequent programs, have always put in more protections. The program also expressly requires an oversight board to ensure that the Center is conducting objective science. So we have unique facts here that the program expressly calls not for the collection of fish data, but for the continued operation of the Fish Passage Center. I'm sorry, does the Act, the Power Act, the Northwest Power Act, require the continued funding of the Passage Center as it had existed in the past? The Power Act does not, Your Honor, but the program does. And the greatest... Is it your position that the Bonneville Power Authority is powerless to change, refine, streamline the Passage Center's duties? The duties are very expressly listed in the program as well. I don't think they're powerless in that they do have some discretion, although it is a very high standard as the Council has set forth. They haven't demonstrated that this has created any conflict with its other power purposes or with its business purposes or the other authorities it has under the Act. There's simply no reason in the record in particular that Bonneville is not funding this other than the report language, which of course is not binding legislation. You described their justification as post hoc. Could they start things anew and demonstrate that as a justification and survive scrutiny? There is that potential, Your Honor, that there would be some justification. I can't think of any other than a direct statutory conflict, which they certainly have the implied discretion to decide that. But here, we don't have any of those facts. There is no conflict. The Center is expressly called for. And with respect to Your Honor's question regarding harm, in particular the record shows that there will be harm to the real-time collection of this data. And what that means is over the years, starting back in the early 80s, there was something called a water budget. The most important mitigation measure for restoring these fish runs is to get them out to the ocean in the spring for the migration. They can only do that with sufficient water. The water has to be spilled over the dams. It's now called flow. The fisheries managers are tasked with having the real-time data analysis to be able to make requests to the managers of the dams to say, we need the water now at such and such a dam because the fish are coming and we need to get them out to the ocean. Without that real-time ability... I interrupted you. My question was simply, does the current statutory scheme require the BPA to follow the environmental program set by the council? Or does it just say that the BPA shall consider environment as well as power? No, the current statutory, the provision 839B sub H10, which deals with the funding consistent with issue, gives the BPA some discretion but very limited discretion. The BPA focuses on two cases that actually interpret a different provision of the statute, 839BH11, which has very different language. That statutory language says that all federal managers or regulars or operators of dams shall take the program into account and that it shall do it to the maximum extent practicable. None of that language is found in the provision that requires BPA to fund consistent with the program. In most cases, they're going to have a lot of leeway and discretion on how they do that, but in this unique case, the continued operation of the center is called for. Do you want some time for the intervener and some time for rebuttal? Thank you. Okay. Thank you. Counsel? May it please the Court. I'm Tim Weaver. I represent the Yakamaw Indian Nation. I'm going to try and speed talk here if I possibly can. We told you you would have three minutes. You have three minutes. Thank you. Are you the intervener or are you the other plaintiff? The other plaintiff. I'm the other plaintiff, Your Honor. We told you you could have three minutes, right? Yes. Yes. We're the other plaintiffs, the Yakamaw Nation, the joint NBEC. With regard to Judge Silverman's question about the practical effects, very quickly, if you look particularly in the record at the Schertz Memorandum, which is at 318 in our excerpt of record, you'll see a discussion of exactly what the circumstances are and how BPA has changed the potential function of the Fish Passage Center. Also at the DeHart Memorandum at 333, the Fish Passage Advisory Memorandum at 323, sets out the very real changes that have occurred. With regard to the question about can BPA simply start over, the Act makes it very clear, and this is the argument that the Yakamaw Nation has made on deference, is that Bonneville has, in fact, amended the program. Those record sites I just gave you clearly reflect that this is not just a little difference of opinion between BPA and the Council's program. They have done all sorts of things that have, in effect, totally changed the operation of the program and have amended the Fish and Wildlife Program. You're saying, in effect, that the program is the force of law, rather than just being a... What I'm saying is, as co-counsel argued, that the Northwest Power Act requires that BPA fund consistent with the program. They're arguing they only have to take it into consideration, think about it, look at it, and then do what they want. I think when you look at, for instance, the ruling of this court in NRIC versus, and the Yakamaw Nation versus NPPC, the discussion there in footnote 15 clearly reflects that Congress didn't intend to create an energy czar and clearly states that BPA is required, even though it has great discretion, to fund these programs consistent, not take into consideration, but consistent with the Fish and Wildlife Program. And the program's put together by the council, and the council is composed of representatives of the four states? That's correct, Your Honor. And the Indian Nation, the Yakama Nation, I assume has some input into who the governors appoint to the council. We have some input, but very little consideration of that input, Your Honor. And that's what the situation was in the NRIC and Yakama Nation versus the Power Council, in which this court ruled that the Yakama Nation in the implementation of that program was entitled to substantial high deference from the council for their fish and wildlife provisions. This is somewhat of a unique statute. It varies. It's federal law, but it also sets up this council that is empowered by the states, at least its composition. So it's a little hard to figure this one out. It is. It is difficult. But I think that what the court needs to remember is the requirement that DPA number one is not an energy czar. They don't have the right to do whatever they want under this statute. They're constrained by the provision of the statute to fund the Fish and Wildlife Program consistent with the program. Number two, if they were to start over and do what they've done now, they will, in effect, amend the program. And the act has a specific set of steps they have to take to do that, including public hearings, input from all sorts of people, and, most importantly, deference to not only the Yakama Nation, the other tribes that are involved in the states of Oregon, Washington, Idaho, and Montana's fishery agencies. I think we've taken you over the plaintiff's time, or petitioner's time, I guess. But let me ask this question. If BPA set up notice and comment rulemaking, could they do that to amend the program? Interesting question. Interesting question. And I'm not sure I have the specific answer. But I think that at least my position would be, Your Honor, that they would have to follow the Northwest Power Act, which specifically requires, for instance, in 4H2C, that they seek out recommendations. And the council, really, I believe the council is vested with that authority. So to alter the program, and you think they have to follow the specific statutory procedure in the Power Act? That's certainly my opinion, which includes the deference argument that I've made to the Court that I was going to explain, but I've run out of time. Thank you. Thank you. Thank you for your argument. We'll hear from the authority at this time. Could I get one point clarified on the argument? Sure. Is the council's representative here on the back bench there? Oh, I'm right here. All right. We announced in three minutes. The front bench. Okay. So you're going to have three minutes separate from the BPA's time. Right. They may not be using any of it. Okay. But I think we've allotted it if you want it. Yes. Good morning, Your Honors. May it please the Court. My name is Steve O'Dell. I'm an assistant United States attorney for the District of Oregon, representing the respondent, Bonneville Power Administration, in the petitions for review before the Court. With me at council table is Philip P., an attorney in the Bonneville Power Administration Council's office. Your Honors, there are obviously a lot of issues that have been briefed. I see the stacks of paper on the dais. Respectfully, I think that there is a dispositive issue before the Court that can cut through a lot of the chaff and get down to the nub of the issue, and that is the question of the construction of the provision that the petitioners allege Bonneville has violated, namely Section 4H10A. In particular, the scale of that duty and the nature of the duty, more particularly whether it operates to effectively make each and every measure in the council's Fish and Wildlife Program an imperative that Bonneville has an affirmative mandatory duty to fund and implement, or whether it's to serve as a guide, an important guide to be sure, but nonetheless a guide consistent with this Court's earlier precedence on the matter, that Bonneville is to rely on in making its funding decisions. So we have to back up. Bonneville seemed to think that it had to discontinue the funding of the Fish Passage Center. Not that in its discretion it decided it would be a good idea, but they thought that Congress mandated it. Well, Your Honor, I would certainly concede to you that the administrative record in this case is not necessarily a model of clarity. On the other hand, It's a model of deception, isn't it? No, Your Honor. With all respect, I don't think that's a fair characterization. Well, how about the statement that Congress passed an act requiring them to do this? Well, I heard a question from the bench earlier that seemed to suggest or at least imply that perhaps that was an erroneous statement, a mistake, and that That's wrong, isn't it? It is wrong, but it is certainly not a reflection of the whole record that's before the court. And as you know, the Northwest Power Act calls upon the court to rely upon the scope of review provisions of the Administrative Procedure Act to determine what it is to consider in reviewing these petitions. In 5 U.S.C. Section 706, the APA makes clear the court is to look at the whole record. And we would look at the whole record. We would try to determine if what the agency did was arbitrary and capricious or contrary to law. But if it appears, and I'm not saying this is the case, but if from the whole record it appears that the agency thought that they had to do something that was asserted in a congressional report, if it appears that the agency thought that was a mandatory command, whereas several of our Supreme Court justices have told us it's not, maybe all of them, then wouldn't that be contrary to law? Yes, Your Honor, if that was a fair reflection of the whole record. Okay. So your position is the record as a whole would indicate certainly some inconsistencies and some ambiguity on that point. And I think it's important for this Court to acknowledge that the references to the conference committee report language as being binding legislation were in e-mails, were in a background statement attached to a program solicitation, and were in other less formal documentation. There are several other very clear references, however, to the conference committee report language as constituting nothing but conference committee report language and indicating that Bonneville took that into account, was seeking to follow that policy direction and found that it could and still remain consistent with the counsel's program and, more importantly, could still satisfy Section 4H10A, which is the provision that the Petitioners allege that Bonneville has violated. I would call the Court's attention in particular to the supplemented excerpts of record at pages 601, 603, 605, 607, 609, 611, and 615. Those are all letters that the administrator himself of Bonneville wrote to members of Congress and others where he clearly and correctly characterizes the conference committee report language as such. There's no confusion in those. And, in addition, there's a letter from the vice president of Bonneville for Fish and Wildlife at supplemental ER 617 where he goes through a careful analysis of the conference committee report language and indicates that Bonneville had determined it could follow that policy direction at the same time satisfy its obligations under 4H10A. I'd also like to point out quickly, if I might, that under Supreme Court case law, even when an agency explains its decision with less than ideal clarity, a reviewing court is not to upset the decision on that account if the agency's path may be reasonably discerned. That's in Alaska Department of Environmental Conservation against EPA at 540 U.S. 464. I was going to ask you to give us your view of the law on this point. This kind of case on a direct petition for review poses some extra challenges that are different than when we have a district court decision with findings and so on. So we review on the administrative record, but we don't have like a determination of fact after a trial as to what motivated the BPA. So what are the precedents that guide us in how we look at the record? Well, the precedents, I think, are along the lines of what I just cited in the Supreme Court jurisprudence. They rely heavily on a seminal case by the name of Bowman Transportation, that 419 U.S. 281 in 1974 case. And what the court suggested there was that the court is to seek to discern, based on the whole record, what a proper rationale would be to support the agency's decision, and so long as it can make that discerning evaluation is to support the agency's rationale. An agency's decision under the APA, I think it's important to remember, as I mentioned earlier, the Northwest Power Act explicitly incorporates the standards of review of the APA, which provide for highly deferential standard of review of arbitrary and capricious evaluation of the record. So long as there is any rationale or proper basis in the record to support the agency's decision, the court should uphold the decision on that basis. And here, of course, there is ambiguity. There's even an inconsistency, if you will. There's no doubt that those statements about the conference committee report being binding legislation are not correct. We have never asserted to the contrary in our brief. But I think, again, if the court wants to be fair and read the entire record, if it's going to rely on one set of cites for the record or the other, it certainly should look to those citations in the record that reflect formal representations by the administrator himself and the vice president for Fish and Wildlife and not isolated excerpts from e-mails or other background documents. I'll certainly go back and make sure I look at everything in the record before trying to come to a conclusion. Let me ask you a question of theory. Assuming that after looking at everything in the record, we were to decide that the agency made an improper assumption about the significance of a legislative report, then where would we go from there? In other words, I could see in that case assessing consistency if it led you in one direction. It might be an alternative ground for a holding, but if we thought it was consistent, could we write that or would it be a dictum? In other words, if it's an alternative, do we have to ‑‑ can we address consistency if we rule against you on the first issue? I think you can, and I think it goes back to the point I was just making, which is to say that you can certainly make it clear in the opinion, and Bonneville does not dispute this, that those statements in the record referring to the conference committee report as binding legislation are erroneous, and that's not a correct statement of law. However, as I was stating earlier, there are proper grounds in the record to support Bonneville's decision here, and in fact, Bonneville was seeking to follow congressional policy direction. It would be hard for me to understand how this Court, frankly, could find that an agency's following direction on funding from a conference committee report issued by Congress could be deemed arbitrary and capricious. Well, couldn't we find that the conference report is simply a conference report, but the statute requires consistency with the plan? That's how we would come to that conclusion. Well, Your Honor, yes, and that would take me back to some of the points I was trying to get to earlier. Let me just jump real quickly to some congressional intent that is very clear, I think, from some contemporaneous actions of members of Congress at the time or shortly after the conference committee report was issued. In fact, some of the very members of Congress who were opposed to the conference committee report language wanted to make sure that the functions of the Fish Passage Share would continue to be funded by Bonneville and that Bonneville could undertake this transition of the functions. And let me be clear on this because this is a very important point, Your Honors. We're talking only about the who here is going to carry out these data collection and analysis functions, not the what. There have been some allegations in the briefs and this morning that the functions are not going to be passed over. Those are erroneous. Let me just quickly rebut those, if I might, because it's a really important point and I want to make sure that Your Honors understand that those are not correct statements. With all due respect to my opposing counsel, on the real-time data issue, Bonneville very clearly stated that they understood that that was an important component of the functions that the Fish Passage Center has been carrying out. So if you look at the record at Supplemental ER 360, Supplemental ER 361, Bonneville explicitly provides for the new contracts and the new solicitation for the program of work to make sure it provides for real-time data. In terms of the reference to the DeHart memo in the record, every single one of those allegations about how the functions would not be properly carried out under the new contracts have been rebutted, and that document is at Supplemental ER 799-805. Bonneville does not dispute the importance of the functions that the Fish Passage Center has been carrying out. It went through a careful process within the 120-day period that Congress directed it to follow to make sure that all of those functions would be retained and carried out by qualified entities. I don't think any of the petitioners have alleged that the new entities that are going to be carrying out these functions are not qualified, and on the contrary, the record supports the qualifications of these entities. Could you repeat the last ER site you gave? I think it was in the 700 range. Yes, I would be glad to, Your Honor. That's SER 799-805. Thank you. Back to the issue, though, about congressional intent, going back to your question, Your Honor, and that is following along the conference committee report issuance, Senator Inouye went to the floor in a colic week, asked Chairman Domenici, the chairman of the Energy and Water Development Appropriations Subcommittee, about whether or not he could be assured that that conference committee report language was not going to supersede either the Northwest Power Act or the council's program. And in response, in the colic week, Senator Domenici makes very clear, no, the intent of Congress here is very clear. We are not telling Bonneville to violate either the Northwest Power Act or the council's program in transferring the functions. And so it was very clear. Let me just give you the site to that. Even if a legislator had said we are telling them to violate it, why wouldn't that be a so what? Because the Supreme Court has said that legislative reports don't have the force of law. They're not passed by a majority of both houses of Congress. They're not signed by the President. So what does it matter? Well, it matters because the point I'm trying to make, Your Honor, is simply that according to all the members of Congress who spoke to this issue, even some of those who very vociferously opposed the passage of the conference committee report language at issue, none of them in any of the colloquy or the correspondence that I'm citing to here suggested that merely transferring those functions from one entity to alternative entities would violate the program or the Northwest Power Act. So I'm not saying that that is dispositive. I'm saying it's highly relevant, however, when you have opponents of the language coming in to say, now, Bonneville, when you transfer these functions, please make sure you do it in a manner that's consistent with the Northwest Power Act and the program. Okay. I understand. I think I understand that argument. My understanding was there were a few functions that are not covered in the current program that were covered in the Fish Passage Center. So let me just mention a couple of those that I'm thinking of, and you tell me if they are covered. One was that there was a Fish Passage Advisory Committee, as I understand it, with the Fish Passage Center that is not funded. And then second, that there was some type of survival study with the Fish Passage Center that, as I understand it, comparative survival study is not funded under the current program. Am I mistaken in those points, or are all the functions the same? Yes, Your Honor. All of the substantive functions are being transferred, and I don't happen to have a specific site for those particular functions that you mentioned. I'd be glad to provide those if you would allow me to. So your understanding is that they are transferred? Yes, Your Honor. There are documents that we cite to in our brief that demonstrate that all of the functions have been transferred, and I think, again, I want to emphasize to the Court that we're talking here about who, not what, we're talking about who's going to implement, not the functions that are going to be carried out,  I also, if I may quickly point out, the program itself involves hundreds of action measures and objectives, and the Fish Passage Center functions have been treated, like all of the others, through this budget evaluation process, whereby the Council recommends to Bonneville, in the Council's own words, recommends to Bonneville whether or not to fund particular actions, including those functions. Thank you. Thank you for your argument, Mr. Schertz. May it please the Court, I'm John Schertz, I'm the General Counsel for Intervenor Northwest Power and Conservation Council. I think that time should be three minutes, right? Yeah. We didn't want you to think you had to spend 25 minutes. The less the better, I think, for my purposes, right here. Again, I'm John Schertz, the General Counsel for Intervenor Northwest Power and Conservation Council. I want to emphasize we are an unaligned intervenor, taking neither side on the question of the validity of Bonneville's decision on this particular project. I asked for the time, just in case I heard something today from the Council that I felt compelled to respond to, on the issue that we do care deeply about, and that's the general substantive meaning of the underlying standard for the Council's program. There are things I heard, I think, from all Councils that I would take some issue with. I do want to emphasize that, make clear there's nothing in our argument that inexorably we do the conclusion that Bonneville has erred on this particular project. Again, I want to make very clear I have a Council made up of appointees and governors of the states. They take different sides and have different opinions on the validity of that issue. But we are united on the general substantive meaning of the underlying standard, as we have outlined in our briefs. And I haven't heard anything that otherwise causes me to have to respond, so unless the Court has any questions for us, I have nothing to add. I'm in an interesting position. I'm not sure what you would have us do. Again, we have argued in our intervenor's brief, the reason we joined in this case was to make sure that the Court is aware that the Council believes Congress and the states, Congress in passing the Act and authorizing the states to form the compact, and the states to form the compact, believes that our program and our power plan are serious substantive obligations on Bonneville, even while at the same time Bonneville is not bound to every line, provision, and measure. And I realize that, as someone said, it's an unusual statute, and it's one that requires quite some thinking as to how it would work. On pages 30 to 33 of our opening brief, we gave some of our understanding of how it works in a practical matter. And we would like the Court, we would ask the Court to understand consistency in the way we have explained it, which we think is consistent with the way Congress has understood it as a general matter, and apply the standard as we understand it as you analyze whether this particular project decision is valid or not. I took it from your brief that the Council would urge the Court, if it can do so, to clarify what the consistency obligation in the statute means. Yes, we would. In fact, that is the reason we intervened and joined the states. Let me ask you the same question I think I asked both of your colleagues on each side. If we were to determine that there was a mistake of law by the agency with regard to the significance of the committee reports, then can we still go on to address consistency, and how, without it being a dictum? Bonneville made a particular decision that's being challenged as not consistent. If it wasn't compelled to by the Senate, it's still a decision they made. It would seem that would be something the Court would have to deal with is what does consistency mean and how would it apply. I guess I don't have a better answer than that at this stage. Thank you. Thank you. Thank you for your argument. Rebecca, put a minute on this. Judge Gould, I'd like to go back to this consistency question, whether or not you need to reach it. I believe that the answer is no, that it would be improper to reach that question because of the fact that this is not going to be harmless error. And that goes back to the harms that I responded. It would harm the administrative process. The Arizona cattle growers case and the motor vehicle manufacturers case are clear that it's up to these courts not to allow agencies to make unsupported decisions and then to search for the evidence later after they've been challenged. That's not how our system of government works. Moreover, the report language would have been given effect, and the record's clear that that's an improper basis and it should be held to be arbitrary and capricious. So there will be harm. As to consistency in particular, you asked about the Fish Passage Advisory Committee, which was instituted to oversee them because of grumblings and complaints that they weren't doing objective science. That will not be continued under the current scheme of things. With respect to the Comparative Survival Study you asked about, that actually will not be continued under the current schemes. In a post hoc rationalization in March of this past year at SUR, Supplemental ER 801, the BPA starts thinking about it because they're taking all these actions that are post hoc, trying to make them look more and more similar as we approach this argument date with the court. There, SUR 801 actually says that the CSS, the Comparative Survival Study, analyses and reporting, that quote, would have been completed by the Fish Passage Center in 2006, can be deferred. So no, that's not happening. The advisory committee's not happening. These are not consistent with the program requirements. And again, the center and the continued language, continued operation of the center is found in the program. Bonneville commented on the program both in 2000 and the amendments in 2003. They never indicated. They are able to participate in the program process, the development of the program and amendments to the program. Bonneville thanks the council for creating more transparency in the Fish Passage Center and the duties they undertake. They never once said this language is a problem. And if you look at their comments, they do give lengthy comments and make specific comments about specific language within the program and the program amendments. But they didn't do so here. They thank the council for making it more transparent. The exact language says, calls for the continued operation of the Fish Passage Center, the Fish Passage Advisory Council, other duties that the Columbia Basin Fish and Wildlife Authority must undertake. And finally, Your Honor, there's simply no basis in this record. If you look at Bonneville's brief, their sole citation to say that they determined they would be in compliance with the statute is to SIR 617, which is a letter responding to the accommodation. In that letter, in that letter, Bonneville says we have the ultimate discretion to decide how to comply with the act. That is not a cogent explanation that the Supreme Court in Ninth Circuit case law requires when determining whether or not that decision was arbitrary and capricious. I'd like to ask you a question I asked your colleague from the Yakima Nation Council. Could the agency do notice and comment rulemaking to address the scope of an environmental program, or are they bound by a specific statutory procedure that's different from that? Your Honor, Congress gave that duty and responsibility to the council. And the Northwest Power Act is unique, and it's very express and explicit as to what the council is required to do when it is developing the program. Much of that is very well discussed in the NRIC and Yakima Nation case against the Northwest Power Planning Council. Very well explained. To do so, to say that Bonneville could undertake some other procedure, even if it were a public notice and comment procedure, would be to implicate the Northwest Power Act itself. Congress has spoken about how this program is developed, and Congress has been clear about what Bonneville's duties are once that program is adopted. Okay. Thank you for your argument. Thank both sides for their argument. Another very interesting case, and the Court will stand in recess for today.
judges: Hawkins, Silverman, Gould